## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

JAMES McINTOSH                                          CIVIL ACTION

VERSUS                                                  No. 21-1719

ROBERT GOINGS, ET AL.                                   SECTION I

### ORDER & REASONS

The plaintiff, James McIntosh ("McIntosh"), an inmate at Rayburn Correctional Center ("RCC") in Angie, Louisiana, filed a complaint[1] for damages, alleging constitutional violations pursuant to 42 U.S.C. § 1983, as well as state law tort claims. The defendants have filed a motion[2] for summary judgment, arguing that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars McIntosh's claims.[3] Alternatively, they argue that the defendants are entitled to qualified immunity.[4] The Court concludes that *Heck* bars McIntosh's claims for the reasons stated below.

## I.      BACKGROUND

"This case involves an all-too-common set of facts: [plaintiff] (a prisoner) claims that [defendants] (prison officers) spontaneously and unlawfully abused him. [Defendants], on the other hand, insist they used lawful force to control [plaintiff's] misbehavior." *Santos v. White*, 18 F.4th 472, 477 (5th Cir. 2021) (Willett, J., concurring). McIntosh asserts that the defendants harmed him during two incidents

---

[1] R. Doc. No. 19 ("Amended Complaint for Damages/Use of Force").
[2] R. Doc. No. 43.
[3] R. Doc. No. 43-1, at 17.
[4] *Id.* at 23.

at RCC in 2020. The defendants are RCC officers, namely: Robert Goings ("Goings"), Jonathan Stringer ("Stringer"), Jacob Waskom ("Waskom"), and Mickey Dillon ("Dillon").[5]

## A.   McIntosh's Version of Events

### 1.   The Wind Unit Incident

According to McIntosh, he regularly would steal and then sell extra food from the RCC kitchen.[6]  McIntosh claims that Goings and Stringer pressured McIntosh to

---

[5] R. Doc. No. 19, at 2–3.  McIntosh asserts his § 1983 claim against Goings, Stringer, Waskom, and Dillon.  *Id*. at 9.  McIntosh also named the State of Louisiana, through the Louisiana Department of Public Safety and Corrections, as a defendant.  *Id*. at 3. McIntosh alleges liability under a state law negligence theory and *respondeat superior* with respect to the State of Louisiana.  *Id.* at 9 ¶¶ 46–48.

[6] In accordance with Local Rule 56.2, McIntosh filed a statement of facts in opposition to defendants' motion for summary judgment.  *See* R. Doc. No. 54.  However, McIntosh largely denies defendants' assertions of fact without referencing specific evidence to support his denials.  *Id*. at 1–3.  In his memorandum opposing summary judgment, McIntosh cites repeatedly to "Ex 1 and Petition," in support of his version of events. *See*, *e.g.*, R. Doc. No. 49, at 9 ("Furthermore, McIntosh stated that Goings was involved in some illegal activities at RCC and he was being retaliated against for not falling in line.  Ex 1 and Petition, ¶¶ 8-21.").  McIntosh's Exhibit 1, *see* R. Doc. No. 49-1, contains on the first page a declaration asserting that "the facts found in my ARP, Petition, Appeal from the Disciplinary Board to the Secretary of the Department of Corrections and Appeal filed in the 19th JDC East Baton Rouge are true and correct under penalty of perjury."  *Id*. at 1.

Although McIntosh is presently incarcerated, he has retained counsel to represent him.  *See*, *e.g.*, R. Doc. No. 49, at 20.  Therefore, the Court will not liberally construe McIntosh's pleadings as it would do so for a *pro se* plaintiff.  *See*, *e.g.*, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]") (internal quotation marks and citations omitted).  Nevertheless, the Court interprets "Ex 1 and Petition, ¶¶ 8-21" as an indication that McIntosh has verified his "Amended Complaint for Damages/Use of Force," *see* R. Doc. No. 19, as this is the most recent version of his "petition" in the record.  *Cf*. R. Doc. No. 1-1 ("Petition for Damages/Use of Force," which the defendants removed from state court).

become a prison informant in exchange for avoiding discipline for stealing food, but McIntosh denied knowing any useful information.[7]  McIntosh also alleges that Goings and Stringer intended to harm McIntosh as retaliation for trouble that resulted from other officers discovering that McIntosh was selling stolen food.[8]

Regarding the events on October 19, 2020, McIntosh recounts that around 7:00 A.M., Stringer ordered McIntosh to exit the Wind Unit facility and to proceed to the Wind Unit breezeway.[9]  McIntosh claims that officers assault inmates on the breezeways because there are no video cameras in that area.[10]  Goings and Stringer approached McIntosh, and Stringer ordered McIntosh to turn around to be restrained.[11]  McIntosh asked, "[a]re y'all going to F#@! me over?" and Stringer responded, "yes."[12]

McIntosh dropped his cup of coffee, and he tried to run into an area in view of a video camera.[13]  Stringer grabbed McIntosh, causing him to fall to the concrete floor where he struck his head and became dazed.[14]  Goings and Stringer then punched McIntosh and slammed him to the floor.[15]  McIntosh sustained two blows to the back of his head and two blows to the left side of his face.[16]  Stringer, Going—and then

---

[7] R. Doc. No. 19, at 3–4 ¶¶ 9–11.
[8] *Id.* at 4–6 ¶¶ 12–22.
[9] *Id.* at 6, ¶ 23.
[10] *Id.* at 6 ¶¶ 24–25.
[11] *Id.* at 6 ¶ 26.
[12] *Id.*
[13] *Id.* at 6 ¶ 27.
[14] *Id.* at 6–7 ¶¶ 27–28.
[15] *Id.* at 6–7 ¶¶ 28–29.
[16] *Id.* at 7 ¶ 29.

Waskom—struck McIntosh with their knees and punched him in his face.[17]  McIntosh was then placed in full restraints.[18]

### 2.   The Sun Unit Incident

While in restraints, Waskom and Dillon then escorted McIntosh to the Sun Unit.[19]   Waskom and Dillon proceeded to beat McIntosh, and they slammed McIntosh's head into a Sun Unit door three to four times.[20]   Waskom also struck McIntosh with his knee, and he punched McIntosh.[21]   According to McIntosh, he suffered a lost tooth, a split tongue, a concussion, and his back, neck, knee, and ankles were cut and/or bruised.[22]

## B.   Defendants' Version of Events

### 1.   Wind Unit Incident

According to defendants, on October 19, 2020, at approximately 7:05 A.M., Stringer was making unannounced rounds in Wind 1 dormitory.[23]   While Stringer was making his rounds, McIntosh looked at Stringer and said, "[w]hat the [f]uck are you looking at?"[24]   Stringer verbally ordered McIntosh to stop cursing, and McIntosh

---

[17] *Id.*  McIntosh does not state when Waskom arrived at the scene.  *Id.*
[18] *Id.* at 7 ¶ 30.
[19] *Id.* at 7 ¶ 31.
[20] *Id.* at 7 ¶ 32–33.
[21] *Id.* at 7 ¶ 32.
[22] *Id.* at 7 ¶ 34.
[23] R. Doc. No. 43-8, at 2; *see also* R. Doc. No. 43-2, at 1–3; R. Doc. No. 43-4, at 1–3.
[24] R. Doc. No. 43-8, at 2.

complied.[25]  McIntosh then continued to aggressively question Stringer, and Stringer ordered McIntosh to exit the dormitory.[26]

McIntosh exited the dormitory onto the breezeway, and Stringer ordered McIntosh to stop.[27]  McIntosh complied, but stated, "[w]hat the [f]uck you want?"[28] Stringer ordered McIntosh to place his cup of coffee on the ground, turn around, and place his hands behind his back.[29] McIntosh refused and stated, "[you're] not fucking touching me."[30]  Stringer again ordered McIntosh to turn around and place his hands behind his back.[31]  McIntosh again refused and stated, "[y]ou better not fucking touch me."[32]

Stringer then placed his right hand on McIntosh's right wrist, and McIntosh jerked his hand from Stringer's grasp.[33]  McIntosh then threw his coffee towards Goings, striking Goings in the chest and face.[34]  McIntosh then attempted to run past Stringer, and Stringer tried to "secure [McIntosh's] upper torso."[35]  Meanwhile, Goings called via radio for assistance.[36]  McIntosh then began to strike Stringer and Goings in the head with his closed fists.[37]

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*  Stringer does not state when Goings arrived on the scene.  *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*

Waskom heard Going's radio call, and Waskom arrived to witness Stringer and Goings trying to "direct" McIntosh to the ground, while verbally ordering McIntosh to stop resisting.[38]   McIntosh refused, and Waskom approached and grasped McIntosh's upper torso.[39]   Stringer, Goings, and Waskom succeeded in bringing McIntosh to the ground, and McIntosh continued to aggressively kick his legs.[40] Waskom began pulling McIntosh's left arm from under McIntosh's body, and Going assisted by grabbing McIntosh's left wrist.[41]

McIntosh next began biting Goings' left arm, and Waskom "delivered a palm heel strike to [McIntosh's] right brachial nerve motor point," while commanding McIntosh to stop biting Goings.[42]   Goings succeeded in removing his arm from McIntosh's mouth, and Stringer and Waskom were able to place McIntosh's hands behind his back.[43]  Waskom applied handcuffs while another officer applied shackles to McIntosh's feet.[44]  Once defendants placed the restraints on McIntosh, they ceased using any force.[45]

   2.   *Sun Unit Incident*

Once McIntosh was restrained in the Wind Unit, Waskom and Dillon escorted McIntosh to the Sun Unit area of RCC.[46]  At Sun Walk, McIntosh began cursing the

---

[38] *Id.  See also id.* at 5.
[39] *Id.* at 5.
[40] *Id.* at 2.
[41] *Id.  See also id.* at 5.
[42] *Id.* at 5.
[43] *Id.* at 5.
[44] *Id.* at 2.
[45] *Id.*
[46] *Id.* at 5.  *See also* R. Doc. No. 43-3, at 2–4; R. Doc. No. 43-5, at 1–2.

officers.[47]  McIntosh also began to drag his feet.[48]  Waskom commanded McIntosh to stop talking and walk.[49]  McIntosh then walked a short distance before dragging his feet again.[50]

When the group approached the front door of Sun Unit, McIntosh attempted to kneel and raise his feet off the ground.[51]  Waskom loudly ordered McIntosh to stand up, and McIntosh refused, stating "[m]an[,] [f]uck [y]ou."[52]  Waskom again ordered McIntosh to stand, and McIntosh complied, placing his feet back on the ground.[53]

The group entered Sun Unit and approached the Sun Key door.[54]  Waskom ordered McIntosh to kneel, and McIntosh responded, "[f]uck that.  I'm standing now bitch."[55]  Waskom ordered McIntosh several times to kneel, and McIntosh refused to comply.[56] Waskom then "delivered a knee strike to [McIntosh's] left common peroneal nerve," and again ordered McIntosh to kneel.[57]  McIntosh reluctantly complied.[58] Once McIntosh was on his knees, Waskom "released control of him and all use of force ceased."[59]

---

[47] R. Doc. No. 43-8, at 5.
[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*

### C.   The RCC Disciplinary Hearings

Following these incidents, the RCC Disciplinary Board ("the Board") held hearings on October 21 and October 28, 2020.[60]   The Board documented these hearings in two disciplinary report forms.[61]

The first report form includes a signed narrative written by Stringer, detailing his version of the events that occurred in the Wind Unit.[62]   The Board noted that McIntosh pleaded not guilty to allegations that he violated RCC Rule 3 ("defiance")[63] and Rule 5 ("aggravated disobedience"),[64] but that the Board found him guilty.[65] Under the section labeled "reasons for disposition," the Board marked that the officer's report is clear and precise, the officer's version is determined to be more credible than the inmate's version, and that the only defense was a denial of the

---

[60] *Id.* at 2, 5.

[61] *Id.*

[62] *Id.* at 2.

[63] Under the Louisiana Department of Public Safety and Corrections' Disciplinary Rules, Rule 3 provides that "[n]o offender shall commit or threaten physically or verbally to commit bodily harm upon another person." R. Doc. No. 43-8, at 26.  Also, "[n]o offender shall curse, insult or threaten another person in any manner. [...] Further, no offender shall obstruct, resist, distract or attempt to elude staff in the performance of their duties.  Nor shall an offender intimidate or attempt to intimidate staff to manipulate staff's actions." *Id.*

[64] Rule 5 provides that "[o]ffenders must obey direct verbal orders cooperatively and promptly and not debate, argue or ignore orders before obeying.  The last order received must be obeyed when orders conflict.  Even orders the offender believes improper must be obeyed; grievances must be pursued through proper channels." *Id.*

[65] *Id.* at 2.

contents of the report.[66]  The form further states that with respect to the Rule 5 violation, the Board imposed a loss of 60 days good time credit.[67]

The second report form includes a signed narrative written by Waskom, detailing his version of the events that occurred in the Wind Unit and the Sun Unit.[68] The form indicates that McIntosh pleaded not guilty to allegations that he violated RCC Rules 3 and 5 for defiance and aggravated disobedience, but that the Board found him guilty.  Under the section labeled "reasons for disposition," the Board again marked that the officer's report is clear and precise, the officer's version is determined to be more credible than the inmate's version, and that the only defense was a denial of the contents of the report.[69]  The form further states that with respect to the Rule 3 violation, the Board imposed a loss of 60 days good time credit and a loss of 15 days good time credit with respect to the Rule 5 violation.[70]

McIntosh filed a petition for judicial review in the Nineteenth Judicial District Court for the Parish of East Baton Rouge to contest his disciplinary decisions.[71] McIntosh did not point to evidence that the disciplinary decisions have been overturned or otherwise terminated in his favor.[72]

---

[66] R. Doc. No. 43-8, at 2.
[67] *Id*. at 3; R. Doc. No. 54, at 2 (admitting that the Board imposed a loss of 60 days of good time credit for the Rule 5 violation).
[68] R. Doc. No. 43-8. at 5.
[69] R. Doc. No. 43-8, at 2.
[70] *Id*. at 3; R. Doc. No. 49, at 11 (noting that the second report indicates a loss of 15 days good time for the Rule 5 violation).
[71] R. Doc. Nos. 43-10, 43-11, & 54, at 2 ¶ 6 ("Plaintiff appealed all of the disciplinary violations").
[72] R. Doc. No. 49, at 12.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the absence of evidence supporting the other party's case.  *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial.  *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).  Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable

10

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *See Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

## III.   LAW & ANALYSIS

### A.   McIntosh's § 1983 Claim

The defendants first argue that they are entitled to summary judgment pursuant to *Heck*.[73] *Heck* bars the litigation of a § 1983 claim if success on that claim "would necessarily imply that a prior conviction or sentence is invalid." *Aucoin v. Cupil*, 958 F.3d 379, 382 (5th Cir. 2020) (citing *Heck*, 512 U.S. at 486–87). The rationale is that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments[.]" *Heck*, 512 U.S. at 485–86. "[C]ourts are wary of duplicative litigation and the potential for conflicting judgments." *Aucoin*, 958 F.3d at 382.

---

[73] R. Doc. No. 32-3, at 9–23.

However, where the "'plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff,' the claim implicates none of these concerns and may therefore proceed." *Id.* (quoting *Heck*, 512 U.S. at 487). "Determining whether the § 1983 claim challenges the conviction is 'fact-intensive.'" *Id.* (quoting *Bush v. Strain*, 513 F.3d 492, 497 (5th Cir. 2008)). A hallmark of a non-*Heck*-barred claim is "if the factual basis for the conviction is temporally and conceptually distinct" from the civil claim. *Bush*, 513 F.3d at 498.

But the *Heck* bar extends further: even where the plaintiff's "*factual allegations* supporting the claim are necessarily inconsistent with the validity of the conviction," *Heck* still bars the claim. *Aucoin*, 958 F.3d at 383 (citing *Bush*, 513 F.3d at 497; *DeLeon v. City of Corpus Christi*, 488 F.3d 649, 656–57 (5th Cir. 2007)). That is true regardless of a civil claim's "theoretical compatibility" with the criminal conviction. *Daigre v. City of Waveland*, 549 F. App'x 283, 286 (5th Cir. 2013) (quoting *Bush*, 513 F.3d at 498 n.14); *see also Thomas v. Pohlmann*, 681 F. App'x 401, 407 (5th Cir. 2017) (citing with approval *Daigre* and *DeLeon*).

To overcome the *Heck* bar, the plaintiff must show that the prior criminal proceeding terminated in his favor—*i.e.*, "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 487. The plaintiff has the burden to prove that the criminal proceedings terminated in his favor. *Hoog-Watson v. Guadalupe Cnty.*, 591 F.3d 431, 435 (5th Cir. 2009). Absent such a showing, a *Heck*-barred claim should be

12

"dismissed with prejudice to [its] being asserted again until the *Heck* conditions are met." *DeLeon*, 488 F.3d at 657 (quoting *Johnson v. McElveen*, 101 F.3d 423, 424 (5th Cir.1996)).

### 1.    Proper Evidence to Consider on Summary Judgment

McIntosh puts forward several arguments in opposing summary judgment. First, as a threshold issue, he disputes which evidence the Court may consider to decide the defendants' motion.   McIntosh maintains that the Court should not consider the Board's disciplinary reports because those reports are inadmissible "hearsay and inherently unreliable."[74]   The defendants reply that they offer the Board's reports not "as truth for the matters asserted therein, but rather, as the basis for which Plaintiff was found guilty of disciplinary violations which resulted in a loss of good time credits."[75]

A statement is hearsay if it is not made while testifying and a party "offer[s it] in evidence to prove the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).  "The reports submitted by the defendants were offered to demonstrate that the disciplinary board had found [McIntosh] guilty of various offenses, not to prove the truth of the matter, that is, that he actually had committed the offenses." *Santos v. White*, 18 F.4th 472, 477 (5th Cir. 2021).  "As with criminal convictions, the *Heck* bar does not, in theory, assume that the prison disciplinary board's determinations were true, but only that they cannot be challenged through § 1983." *Id.   See also*

---

[74] R. Doc. No. 49, at 18.
[75] R. Doc. No. 577, at 2.

*Aucoin v. Cupil*, 958 F.3d 379, 381 (5th Cir. 2020) (holding that courts "may also examine the prison disciplinary reports to understand the basis of the underlying conviction."). The Court may therefore consider the Board's disciplinary decisions when it considers whether McIntosh's claims are *Heck*-barred.[76]

### 2. *Heck* Applies to McIntosh's RCC Disciplinary Proceedings

Next, McIntosh argues that *Heck* does not apply to prison disciplinary proceedings.[77] "Contrary to [McIntosh's] repeated protestations, because *Heck* applies to both the validity *and the duration* of the confinement, '*Heck*'s principle extends to [prison] disciplinary convictions' in addition to criminal convictions." *Gray v. White*, 18 F.4th 463, 467 (5th Cir. 2021) (quoting *Bourne v. Gunnels*, 921 F.3d 484, 490 (5th Cir. 2019)). "[F]or purposes of *Heck*," a "'conviction' ... includes a ruling in a prison disciplinary proceeding that results in a change to the prisoner's sentence,

---

[76] McIntosh has also filed a motion for an adverse inference based on a claim that RCC video footage was spoliated. *See* R. Doc. No. 36. McIntosh references this argument to oppose summary judgment, but he does not specifically state that it has any bearing on whether his claims are *Heck*-barred. *See* R. Doc. No. 49, at 8–9. Overall, this argument is unavailing. Even if the Court were to grant the spoliation motion, the remedy that McIntosh seeks is an adverse inference. *See* R. Doc. No. 36-3, at 14. Such an inference would not help McIntosh withstand summary judgment.

First, even with such an inference, the Court's resolution of the *Heck* bar issue, discussed below, would not be altered since McIntosh's "factual allegations supporting [his] claim are necessarily inconsistent with the validity of [his] conviction[s]." *Aucoin*, 958 F.3d at 383. Second, even with an adverse inference, McIntosh has still not "produced evidence that the alleged excessive force occurred after [he] stopped resisting[.]" *Bush*, 513 F.3d at 500. *See also Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 202 (5th Cir. 2012) ("Although all justifiable inference[s] must be drawn in favor of the non-movant, the non-movant still cannot defeat summary judgment with speculation, improbable inferences, or unsubstantiated assertions." (citations omitted)).

[77] R. Doc. No. 49, at 13–20.

including the loss of good-time credits." *Clarke v. Stalder*, 154 F.3d 186, 189 (5th Cir. 1998) (en banc). Therefore, *Heck* precludes § 1983 litigation in the prison-disciplinary-proceeding context where it would "negate [the prisoner's] disciplinary conviction" if negating that conviction would "affect[ ] the duration of his sentence by restoring his good time credits." *Bourne*, 921 F.3d at 491. Whether the plaintiff in fact seeks the restoration of good time credits, rather than another remedy such as damages, is immaterial. *Aucoin v. Cupil*, 958 F.3d 379, 383 (5th Cir. 2020).

The RCC disciplinary records demonstrate that McIntosh lost good time credit as a result of the incidents in the Wind Unit and the Sun Unit.[78] And McIntosh has not met his burden to demonstrate that these disciplinary decisions have been overturned or terminated in his favor.[79] Therefore, the Board's adverse disciplinary decisions affect the duration of McIntosh's sentence by reducing his good time credit, and *Heck* applies.

### 3.   *Heck* **Bars McIntosh's § 1983 Claim**

In opposition to summary judgment, with respect to the first incident in the Wind Unit concerning Stringer and Goings, McIntosh maintains that the officers used force against him which was unprompted.[80] According to McIntosh, Stringer

---

[78] R. Doc. No. 54, at 2 (McIntosh's response statement of facts) (admitting that the Board "imposed a sentence of loss of 60 days of good time for the Rule 5 violation" concerning the Wind Unit). R. Doc. No. 43-8, at 6 (noting a "[l]oss of 60 days GT" for the Rule 3 violation and a loss of 15 days good time for the Rule 5 violation).
[79] R. Doc. No. 49, at 12.
[80] R. Doc. No. 19, at 6 ¶ 23–24 (stating that McIntosh was merely walking with a cup of coffee when Stringer ordered McIntosh outside and that McIntosh was "fearful but obeyed the order").

informed him that the officers were going to beat him, and then the officers punched McIntosh and slammed his head into the concrete floor.[81]   McIntosh's factual assertions essentially allege that he did nothing wrong.  In other words, McIntosh maintains "his innocence in the events that led up to his disciplinary conviction[s]." *Aucoin*, 958 F.3d at 383.  He insists "that he is wholly blameless for the use of force against him [in the Wind Unit]."  *Id.*  But if true, McIntosh "cannot be guilty of [the offenses for which he lost good-time credit]—in direct conflict with his disciplinary conviction[s]."  *Id.*  This is especially the case when the Board expressly found that Stringer's account was "clear and precise" and "more credible than [McIntosh's]."[82] Therefore, McIntosh's § 1983 claim concerning the incidents in the Wind Unit is barred by *Heck*.

With respect to the second incident with Waskom and Dillon, McIntosh insists that he was "in full restraints while being escorted/dragged to the [Sun Unit]"[83] and during that time "everyone agrees he was not resisting."[84]  "Put simply, there is no *Heck* bar if the alleged violation occurs 'after' the cessation of the plaintiff's misconduct that gave rise to his prior conviction."  *Aucoin*, 958 F.3d at 382.  *See also Bourne*, 921 F.3d at 491 (reversing a grant of summary judgment when "the § 1983 excessive-force claims arise from the specific force defendants used after [the

---

[81] Id. at 6–7, ¶¶ 25–29.
[82] R. Doc. No. 43-8, at 2.
[83] R. Doc. No. 49, at 10.
[84] *Id.* at 6; *see also id.* at 10 (citing to McIntosh's "Petition," at ¶¶ 28–33).

plaintiff] was restrained on his cell floor."). However, McIntosh's argument misrepresents two key points in the record.

First, McIntosh cites to his complaint in support of the contention that he was "in full restraints and not resisting."[85]   But McIntosh's complaint is silent with respect to his own behavior once he was placed in restraints.[86]  The complaint does not affirmatively state that McIntosh was compliant or cooperative.[87]  And McIntosh points to no evidence in support of the contention that he was not resisting.[88]

"Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003); *see also United States v. Del Carpio Frescas*, 932 F.3d 324, 331 (5th Cir. 2019) ("Judges are not like pigs, hunting for truffles buried in the record."); *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) ("[A]lthough [the non-movants] submitted two volumes of evidentiary material [in

---

[85] R. Doc. No. 49, at 10 (referencing "Petition, ¶¶ 28-33").

[86] R. Doc. No. 19, at 7–9 ¶¶ 30–44.

[87] Again, the Court's analysis regards McIntosh's complaint as verified, and thus competent summary judgment evidence. *Falcon v. Holly*, 480 F. App'x. 325, 326 (5th Cir. 2012) (per curiam) ("[A] verified complaint and other verified pleadings serve as competent summary judgment evidence."); *Hart v. Haiston*, 343 F.3d 762, 765 (5th Cir. 2003) ("On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit."). Nevertheless, his complaint does not specifically allege that he was not resisting, and McIntosh—represented by counsel—offers no other citation to any support for this contention.  *See* R. Doc. No. 49, at 6, 10.

[88] R. Doc. No. 49, at 9–12; R. Doc. No. 10 (scheduling order), at 5 (instructing the parties, that to support or oppose summary judgment, "[c]itations to record evidence shall indicate, whenever applicable, an exhibit reference, page reference, and record document number reference. Record evidence not specifically referred to by the parties may not be considered by the Court.").

opposition to summary judgment], they did not identify the specific portions of such evidence (if any) that supported their [claim].").  McIntosh has not "produced evidence that the alleged excessive force occurred *after [he] stopped resisting*[.]"  *Bush*, 513 F.3d at 500 (emphasis added).

Second, McIntosh contends that "[t]here is nothing in [d]isciplinary [r]eports about any resistance by McIntosh after he was placed in restraints."[89]  But McIntosh ignores the record.  Waskom's narrative, incorporated in the Board's second report, recounts that once McIntosh was on "Sun Walk," McIntosh "began cursing [Waskom] and other officers and began to drag his feet."[90]  Waskom gave McIntosh several orders, and McIntosh complied "momentarily" before dragging his feet again after a short distance.[91]  Once McIntosh reached the front door of the Sun Unit, McIntosh "attempted to kneel down and pick[ ] his feet up off the walk."[92]  McIntosh refused orders to stand up, swearing at the officers.[93]  Once inside the Sun Unit, McIntosh was ordered to kneel down, and McIntosh replied, "Fuck that.  I'm standing now bitch."[94]  And only after Waskom gave McIntosh several more orders to kneel, Waskom delivered "a knee strike" to McIntosh's "left common peroneal nerve," and McIntosh "reluctantly complied."[95]

---

[89] R. Doc. No. 49, at 11.

[90] R. Doc. No. 43-8, at 5.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

Again, the Board found Waskom's report to be "clear and precise," and "more credible than [McIntosh's version of events]."[96]  This factual basis therefore shows that McIntosh had "been resisting *throughout* the encounter."  *Aucoin*, 958 F.3d at 384 n.1 (emphasis in original); *id*. at 381 ("Aucoin was found guilty of defiance, aggravated disobedience, and property destruction for misconduct in his cell.  *But his misconduct ceased while he was in his cell*.") (emphasis added); *cf. Santos*, 18 F.4th at 478 ("Moreover, the disciplinary board imposed no sanctions at all on Santos for actions after the administration of the chemical agent in the shower, and it noted that he 'complied with orders' after that point. Thus, *Heck* does not bar Santos's claims from that point onward.").

"Here, the disciplinary reports round out [the Court's] understanding of the events leading up to [McIntosh's] disciplinary infraction[s]—and provide a fuller account of what transpired[.]"  *Aucoin*, 958 F.3d at 381.  Overall, McIntosh's complaint turns on a single narrative: that he was attacked without provocation. This theory is fundamentally inconsistent with the Board's crediting the officers' narratives, and his claim therefore "challenges the factual determination that underlies his conviction[s]."  *Id*. at 384.  McIntosh's § 1983 claim is therefore barred by *Heck*, and the Court must grant summary judgment in favor of defendants with respect to this claim.[97]

---

[96] *Id*.

[97] McIntosh also argues that this Court must hold an evidentiary hearing to determine "the exact conduct covered by the disciplinary complaint and the evidence offered for the findings by the disciplinary hearing officer."  R. Doc. No. 49, at 9 (referencing *Gray v. White*, 18 F.4th 463 (5th Cir. 2021), and *Santos v. White*, 18 F.4th

## B.   McIntosh's State Law Claims

The Court has concluded that McIntosh's § 1983 claim is barred, so only his state law claims remain.   A district court has "wide discretion" when deciding whether it should retain jurisdiction over state law claims once all federal claims have been eliminated.  *Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir. 1999).   However, the general rule in the Fifth Circuit is "to dismiss state claims when the federal claims to which they are pendent are dismissed."  *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992).

A district court may decline to exercise supplemental jurisdiction over a state law claim if:

(1)  the claim raises a novel or complex issue of State law,
(2)  the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3)  the district court has dismissed all claims over which it has original jurisdiction, or
(4)  in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

---

472 (5th Cir. 2021)).  He similarly insists that summary judgment is inappropriate because no audio recordings have been produced of the hearings, which would further clarify the Board's findings.  R. Doc. No. 49, at 11–12.  First, McIntosh's argument overlooks that neither *Gray* nor *Santos* mandated an evidentiary hearing; instead, both cases noted that the Fifth Circuit did not "suggest how the [district] court should rule on which claims are precluded by *Heck*," on remand.  18 F.4th at 470; 18 F.4th 477.  Second, McIntosh's contention that he is wholly blameless means that the Court "need not dwell on the component elements" of McIntosh's disciplinary convictions to determine that "his claims are incompatible with the disciplinary board's findings." *Santos*, 18 F.4th at 478 (Willett, J., concurring).   "Could the record have more information?  Absolutely.  [Does the Court] *need* more?  No."  *Id*. at 447 (emphasis in original).

28 U.S.C. § 1367(c).  In addition to these factors, the Fifth Circuit has instructed district courts to consider the common law factors of "judicial economy, convenience, fairness, and comity."  *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008).  "These interests are to be considered on a case-by-case basis, and no single factor is dispositive."  *Id.*

These factors weigh in favor of dismissing McIntosh's state law claims without prejudice so that he may assert those claims in state court.  The Court has "dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Moreover, allowing Louisiana courts to rule on Louisiana law "encourages fairness between the parties by 'procuring for them a surer-footed reading of applicable law.'"  *Bitte v. EMC Mortgage Corp.*, No. 07-9273, 2009 WL 1950911, at *2 (E.D. La. July 1, 2009) (Africk, J.) (citations omitted) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)).  "[D]eference in this case with respect to the state law issue[s] promotes the important interest of comity to state courts."  *Id.*

Therefore, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  Those claims are dismissed without prejudice, as ordered below.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the motion[98] for summary judgment is **GRANTED IN PART** as set forth below.

---

[98] R. Doc. No. 43.

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** to the extent that McIntosh's § 1983 claim against Goings, Stringer, Waskom, and Dillon is barred by *Heck*, and McIntosh's § 1983 claim is **DISMISSED WITH PREJUDICE** to its being asserted again until the *Heck* conditions are met.

**IT IS FURTHER ORDERED** that McIntosh's state law claims asserting negligence and *respondeat superior* are **DISMISSED WITHOUT PREJUDICE** to their being timely asserted in state court.

New Orleans, Louisiana, April 11, 2022.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**